1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

NOUVEAU VISION, INC., on behalf of itself
and all others similarly situated,              )
                                                )
                         Plaintiff,             )   No.
                                                )
         v.                                     )   CLASS ACTION COMPLAINT
                                                )
TRANSITIONS OPTICAL, INC., ESSILOR              )   JURY TRIAL DEMANDED
OF AMERICA, INC., and ESSILOR                   )
LABORATORIES OF AMERICA, INC.,                  )
                                                )
                         Defendants.            )
                                                )

Nouveau Vision, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated,

brings this action under the federal antitrust laws, Sections 1 and 2 of the Sherman Antitrust Act.

15 U.S.C. §§ 1, 2. The allegations herein are made on information and belief, except those as to

Plaintiff, which are made on personal knowledge.

## NATURE OF THE ACTION

1.      This action arises out of Defendants' and their co-conspirators' longstanding

conspiracy to monopolize the market for the development, manufacture and sale of

photochromic treatments for corrective ophthalmic lenses. Corrective ophthalmic lenses are

used in eyeglasses to correct vision defects. Consumers of corrective ophthalmic lenses may

purchase those lenses with a photochromic treatment to protect their eyes from ultraviolet

CLASS ACTION COMPLAINT - 1

1    ("UV") light, which is found in sunlight.  Lenses with photochromic treatments ("photochromic

2    lenses") darken when exposed to UV light, and fade to clear when removed from UV light.

3        2.    Beginning no later than 1999 and continuing through early March of 2010, and

4    perhaps thereafter, Defendants and their co-conspirators engaged in unfair methods of

5    competition that foreclosed key distribution channels for existing rivals and impeded market

6    entry by potential rivals into the market for photochromic treatments.  Defendants and their co-

7    conspirators engaged in acts and practices that collectively had the effect of improperly

8    maintaining Transitions' monopoly power and unreasonably restraining trade in that market.

9    **JURISDICTION AND VENUE**

10        3.    The claims set forth in this Complaint arise under Section 2 of the Sherman

11    Antitrust Act (15 U.S.C. § 2).  Plaintiff seeks treble damages pursuant to Section 4 of the

12    Clayton Act (15 U.S.C. § 15(a)).

13        4.    The jurisdiction of this Court is founded on Sections 4 and 12 and of the Clayton

14    Act (15 U.S.C. §§ 15(a) and 22), and on 28 U.S.C. §§ 1331 and 1337.

15        5.    Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act

16    (15 U.S.C. §§ 15(a) and 22) and 28 U.S.C. § 1391(b) and (c) in that Defendants are located in,

17    licensed to do business in and/or do business in this District, and a substantial part of the events

18    or occurrences giving rise to the claims alleged occurred in this District.

19    **PARTIES**

20        6.    Plaintiff Nouveau Vision, Inc., is a corporation organized under the laws of the

21    state of Washington, with its principal place of business in Redmond Washington.  During the

22    Class Period, Plaintiff purchased photochromic lenses directly from Defendant Essilor of

23    America, Inc.

24        7.    Defendant Transitions Optical, Inc. ("Transitions"), is a Delaware corporation

25    with its principal place of business in Pinellas Park, Florida.  Transitions is a joint venture

26    between PPG Industries Inc. ("PPG"), which owns 51 percent of Transitions, and Essilor

CLASS ACTION COMPLAINT - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

International SA ("Essilor International"), the parent company of defendant Essilor of America, Inc., which owns 49 percent of Transitions. Transitions is the nation's largest manufacturer and seller of photochromic treatments, accounting for at least 80 percent of all such sales during the last five years, and more than 85 percent of such sales in 2008.

8.     Defendant Essilor of America, Inc. ("Essilor of America"), is a Delaware corporation with its principal place of business in Dallas, Texas. Essilor of America is a wholly-owned subsidiary of Essilor International, a French corporation that is one of the world's largest lens manufacturers. Essilor of America sells more lenses than any other manufacturer in the United States. In recent years, Essilor International has consolidated and expanded its interests in the United States.

9.     Defendant Essilor Laboratories of America, Inc. ("Essilor Labs"), is a North Carolina corporation with its principal place of business in Dallas, Texas. Essilor of America and/or Essilor Labs own majority shares in numerous laboratories that sell photochromic lenses at the wholesale level throughout the United States, including one Jorgenson Optical Supply Company in this district. Essilor of America and Essilor Labs are collectively referred to as the Essilor Defendants.

10.    In 2008, Essilor International's worldwide revenues were $3 billion, with 41.3 percent (approximately $1.27 billion) of those revenues generated in the United States, through its United States interests, including Defendants and their co-conspirators.

## CO-CONSPIRATORS

11.    Co-conspirators John Does 1-150 ("John Doe Co-Conspirators") are laboratories that sell Transitions photochromic lenses at the wholesale level and, to the extent that is relevant to this case, are controlled by the Essilor Defendants. *See* Ex. A (Essilor 2008 Registration Document), at 139-40. Plaintiff cannot determine the identities of all of those laboratories from records that are available to the general public, but anticipates doing so pursuant to discovery in this action.

CLASS ACTION COMPLAINT - 3

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## INTERSTATE TRADE AND COMMERCE

12.     Throughout the Class Period, Defendants and the John Doe Co-Conspirators manufactured, produced, sold and/or shipped substantial quantities of Transitions lenses in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District.  Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## FACTUAL BACKGROUND

### Distribution of Eyeglass Lenses

13.     The distribution of ophthalmic lenses generally includes three stages.  Lens manufacturers – commonly referred to as "lens casters" – convert raw materials supplied by chemical and glassmaking companies into lenses (*e.g.*, single vision lenses, bifocal, trifocals and progressive lenses).  PPG is a major supplier of those materials, particularly to Essilor of America.

14.     Essilor of America is the dominant lens caster in the United States, and owns at least two lens manufacturing facilities, in Carbondale, Pennsylvania, and Dudley, Massachusetts.

15.     Lens casters sell lenses to wholesale prescription optical laboratories ("Prescription Labs").  Prescription Labs grind lenses according to prescriptions from eye-care practitioners, polish semi-finished lenses, apply certain surface treatments (such as anti-scratch and anti-reflective coatings), and in most instances fit lenses into eyeglass frames and deliver finished eyeglasses to eye-care practitioners.  Prescription Labs also typically employ a sales force to promote specific lenses to eye-care practitioners.

16.     Certain Prescription Labs are owned by, controlled by or otherwise integrated with lens casters.  Other Prescription Labs are owned and operated by optical retail chains that generally provide both laboratory and eye-care practitioner (*i.e.*, ophthalmology, optometrist and

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1   optician services) services.  Yet other Prescription Labs, including Plaintiff, operate independent

2   of any lens caster or retailer.

3        17.    During the period relevant to this Complaint, Essilor Labs has owned numerous

4   Prescription Labs throughout the United States, and acquired complete or majority ownership in

5   at least 30 Prescription Labs between 2006 and 2008.

6        18.    Photochromic lens suppliers, such as Transitions, use Prescription Labs and their

7   sales forces to market their lenses because Prescription Labs are the most efficient means to

8   communicate with the tens of thousands of independent eye-care practitioners who prescribe

9   photochromic lenses.

10       19.    Eye-care practitioners and retail chains sell finished eyeglasses to consumers.

11                            **Photochromic Lenses**

12       20.    Transitions treats ophthalmic lenses with photochromic treatments.  Transitions

13  deals directly with lens casters only, as dealing with Prescription Labs or retailers would be

14  inefficient.  Lens casters provide Transitions with untreated lenses, to which Transitions applies

15  photochromic materials.

16       21.    Transitions sells photochromic lenses back to the lens casters from whom it

17  received them, after which they are distributed via the above-referenced distribution chain.

18            **Transitions' Exclusionary Practices at the Lens Caster Level**

19       22.    During the period relevant to this Complaint, Transitions, through exclusive

20  dealing arrangements with lens casters, including written agreements, foreclosed its competitors

21  from dealing with those lens casters, which collectively accounted for over 80 percent of

22  photochromic lens sales in the United States.

23       23.    Transitions maintained its dominance by exclusionary policies at nearly every

24  level of the photochromic lens distribution chain.

25       24.    At the lens caster level – the only effective distribution channel for photochromic

26  treatments – Transitions' anticompetitive polices included, but were not limited to: (1) adopting

CLASS ACTION COMPLAINT - 5

1    and announcing a general policy that it would not deal with lens casters that sold or promoted

2    any competing photochromic lens; (2) exclusive agreements with certain lens casters, including

3    Essilor of America; (3) threatening to terminate its dealings with lens casters that would not sell

4    Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a

5    competing photochromic treatment.

6        25.    Transitions made its intentions clear in 1999, when a rival, Corning Inc.

7    ("Corning") introduced a competitive photochromic lens product, SunSensors. Transitions

8    responded to the competitive threat by terminating the first lens caster to sell SunSensors lenses,

9    Signet Armorlite, Inc.[1] ("Signet").

10       26.    Transitions thereafter refused to deal with any lens caster that sold or promoted a

11   competing photochromic lens. Transitions enforced that exclusionary policy by, among other

12   things, entering into agreements with certain lens casters that expressly require exclusivity, and

13   by publicizing its exclusive dealing policy in the marketplace.

14       27.    For example, in 2005 when lens caster Vision-Ease Lens ("Vision-Ease")

15   introduced its own brand of photochromic lenses, LifeRx, Transitions refused to deal with

16   Vision-Ease. Vision-Ease was able to keep its LifeRx product on the market only by entering

17   into secret negotiations with one of the largest optical retailers in the United States, who

18   committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

19       28.    Transitions' exclusionary policies at the lens caster level effectively precluded

20   even those lens casters that have not signed exclusivity agreements with Transitions from dealing

21   with Transitions' competitors, as those lens casters were aware of Transitions' policy.

22       29.    Because of Transitions' dominant market position and its exclusivity demands,

23   lens casters were faced with: (1) losing Transitions' business, which accounted for at least 40

24   percent of most lens casters' revenues, or (2) endangering their sales of clear lenses, as many

25

26   [1] Consistent with Defendants' general practice, Essilor International permanently removed
     Signet as a competitive threat recently, when EOA Holding Co., Inc., a wholly-owned subsidiary
     of Essilor International, purchased Signet. *See* Ex. B (Essilor press release, Jan. 15, 2009).

CLASS ACTION COMPLAINT - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  retailers and Prescription Labs prefer to buy both clear and photochromic versions of the same

2  lenses.  Losing the ability to sell Transitions lenses to those Prescription Labs and retailers –

3  many of whom have their own exclusivity agreement with Transitions – would deprive any

4  affected lens caster of substantial numbers of potential customers.

5  30.  Lens casters that are exclusive to Transitions collectively account for over 85

6  percent of photochromic lens sales in the United States.

7  31.  Through its contracts and policies, Transitions has deprived Corning and other

8  rival and potential rival photochromic treatment suppliers of the most effective distribution

9  channel – lens casters – thereby removing them as a competitive threat to Transitions' monopoly

10  and effectively deterring such firms from investing in research and development to improve the

11  photochromic products on the market today.

12  32.  Lens casters who might have otherwise developed their own photochromic

13  treatments have learned from the Vision-Ease experience that they cannot do so absent a

14  commitment from a large optical retailer to carry the resulting products.  Since Transitions

15  terminated Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a

16  new line of photochromic lenses in the United States.

17  **Transitions' Exclusionary Practices at the Prescription Lab Level**

18  33.  At least half of all Prescription Labs in the United States – including labs owned

19  by the Essilor Defendants – are owned by lens casters that sell only Transitions' photochromic

20  lenses, thereby substantially eliminating access to those labs for rival photochromic treatment

21  suppliers.

22  34.  So as to limit its competitors' access to independent Prescription Labs as a

23  distribution channel, Transitions has entered into agreements with over 100 Prescription Labs,

24  including 23 of the 30 largest independent Prescription Labs, requiring that those Prescription

25  Labs sell Transitions' lenses as their preferred photochromic lens, and minimize their promotion

26  of competing photochromic lenses.

CLASS ACTION COMPLAINT - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

35.    Transitions' exclusionary Prescription Lab agreements, combined with its agreements with lens casters that own over half of the Prescription Labs in the United States, minimize the ability of Transitions' rivals to promote and sell their photochromic lenses to independent eye-care practitioners (*i.e.*, practitioners unaffiliated with retail chains).

### Transitions' Exclusionary Practices at the Optical Retailer Level

36.    Transitions also directed its exclusionary practices at Prescription Labs and optical retailers via: (1) long-term exclusionary agreements with most major retailers; (2) agreements with Prescription Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and strictly limit their sales efforts for competing photochromic lenses; and (3) offering discounts only to retailers who sold extremely high percentages of Transitions' photochromic lenses, as compared to Transitions' competitors.

37.    These agreements foreclosed downstream outlets for photochromic lenses and created significant barriers to entry to rival photochromic treatment suppliers.

38.    Large optical retailers are one of the most efficient channels of distribution for photochromic lenses to consumers. After terminating Vision-Ease for developing and selling a competing photochromic lens, Transitions entered into exclusive contracts with over 50 optical retailers, including many of the largest retail chains. Most of these exclusive agreements were long-term and included provisions making termination onerous.

39.    Transitions' actions effectively excluded Vision-Ease, other rivals and potential rivals from an efficient distribution channel.

40.    Transitions' conduct minimized the effect of Vision-Ease's entry into the market, deterred potential competitors from attempting to enter the market and effectively prevented Vision-Ease or any other rival photochromic suppliers from restraining Transitions' exercise of monopoly power.

CLASS ACTION COMPLAINT - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**Transitions' Anticompetitive Bundled Discounts**

41.     Transitions' agreements with Prescription Labs and optical retailers generally provide for discounts only to customers who purchase all or almost all of their photochromic lens needs from Transitions.

42.     No other photochromic treatment supplier has a treatment that applies to a full line of ophthalmic lenses.  Transitions' discount structure thus impairs its competitors' ability to compete for sales to those customers, as those customers can neither discontinue nor limit their sales of Transitions' products.

43.     Transitions' bundled discount arrangements erect a significant entry barrier by limiting the ability of rival photochromic treatment suppliers to enter the market with new photochromic treatments suitable for anything less than a full line of lenses.  Those arrangements also strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions.

44.     Transitions' exclusionary practices in dealing with Prescription Labs and optical retailers foreclose its rivals, in whole or in part, from substantial shares of the photochromic lens market at those levels.

**Essilor Defendants' Conspiracy**

45.     At all relevant times, Essilor of America purchased and sold no photochromic lenses other than Transitions' photochromic lenses.  However, unlike other lens casters that entered into exclusive agreements with Transitions, Essilor of America did so in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

46.     Essilor of America also entered into exclusive agreements with multiple Prescription Labs and optical retailers, which required those purchasers to sell and/or actively promote only Essilor lenses.  A necessary result of those agreements was to bolster Transitions' monopoly in the relevant market.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

47.    At all relevant times after their purchase by one or more of the Essilor Defendants, the John Doe Co-Conspirators purchased and sold Transitions photochromic lenses on a substantially exclusive basis.  However, unlike other Prescription Labs that entered into exclusive agreements with Transitions, the John Doe Co-Conspirators did so in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

## FTC Action Against Transitions

48.    On March 3, 2010, the Federal Trade Commission ("FTC") accepted for public comment an Agreement Containing Consent Order to Cease and Desist with Transitions.

49.    The FTC concurrently released a proposed complaint against Transitions (the "FTC Complaint") and the Decision and Order (the "Order") that resulted from its investigation.

50.    The FTC Complaint alleged the following, among other things:

(a)    a relevant market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses (the "Photochromic Treatment Market");

(b)    there are no close substitutes for photochromic lenses;

(c)    Transitions has monopoly power in the Photochromic Treatment Market;

(d)    there are significant barriers to entry into the Photochromic Treatment Market;

(e)    Transitions used unfair methods of competition to maintain its monopoly power in the Photochromic Treatment Market; and

(f)    the anticompetitive effects of Transitions' conduct include: (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

51.    Among other things, the Order:

CLASS ACTION COMPLAINT - 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

(a)    prohibits Transitions from entering into any agreements or adopting any policies that limit its customers' ability to buy or sell competing photochromic treatments, or that require customers to give Transitions' products preferential treatment as compared to its competitors' products;

(b)    prohibits Transitions from entering into exclusive agreements relating to photochromic lenses, or a number of related products and services;

(c)    prohibits Transitions from offering discounts that are based on the degree to which its customers sell Transitions' photochromic lenses as compared to its competitors;

(d)    prohibits Transitions from offering discounts that are applied retroactively after a customer's sales reach a specific threshold; and

(e)    prohibits Transitions from bundling discounts such that customers purchasing more than one line of photochromic lenses obtain additional discounts.

## RELEVANT MARKET

52.    The relevant market is the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States – the Photochromic Treatment Market.

53.    Photochromic lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), and fixed-tint lenses (prescription sunglasses).

54.    There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses.

55.    In 2008, photochromic lenses represented approximately 19 percent of all corrective ophthalmic lenses sold in the United States, totaling approximately $630 million in sales at the wholesale level.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## TRANSITIONS HOLDS MONOPOLY POWER IN THE RELEVANT MARKET

56.    Transitions possesses monopoly power in the relevant market. Transitions' share of the relevant market has been at least 80 percent during each of the past five years. In 2008, Transitions' market share was over 85 percent.

57.    Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unfair methods of competition.

58.    Transitions' monopoly power is also reflected by its ability to exclude competitors and to control prices. The indicia of Transitions' monopoly power include, but are not limited to, Transitions' ability to: (i) coerce lens casters to accept exclusive dealing arrangements; (ii) price its products without regard to its competitors' prices; (iii) impose significant price increases; and (iv) withhold a desired product – a low-priced, private label photochromic lens – from consumers in the United States, even though Transitions supplies it in other markets.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on its own behalf and as a representative of the following class of persons and entities (the "Class"):

> All persons or entities that purchased Transitions lenses directly from Defendants or any of the John Doe Co-Conspirators at any time during the four years preceding the date of this Complaint (the "Class Period"). Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and government entities.

60.    The Class is individually so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this

CLASS ACTION COMPLAINT - 12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least hundreds of members in the Class and that their identities can be learned from records in Defendants' possession, custody or control. Class members are geographically dispersed throughout the United States.

61.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class have all sustained damage in that during the Class Period they purchased Transitions lenses directly from a Defendant or a John Doe Co-Conspirator at artificially maintained, non-competitive prices, established by the Defendants' actions in connection with the anticompetitive behavior alleged herein. Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

64.     The common questions of law and fact common to the Class include, but are not limited to:

      (a)     whether the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States (the "Photochromic Treatment Market") is the relevant market in this case;

      (b)     whether Transitions possesses monopoly power in the Photochromic Treatment Market;

CLASS ACTION COMPLAINT - 13

BYRNES • KELLER • CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

(c)     whether, through the conduct alleged herein, Transitions willfully acquired, maintained and enhanced its monopoly power in the Photochromic Treatment Market;

(d)     whether, through the conduct alleged herein, Defendants and the John Doe Co-Conspirators conspired to confer, maintain or enhance Transitions' monopoly power in the Photochromic Treatment Market;

(e)     whether Defendants and the John Doe Co-Conspirators conspired to engage in unlawful exclusionary conduct to impair the opportunities of Transitions' rivals in the Photochromic Treatment Market;

(f)     whether Transitions entered into exclusionary agreements that unreasonably restrained trade and impaired its rivals in the Photochromic Treatment Market;

(g)     whether Defendants and the John Doe Co-Conspirators engaged in a contract, combination or conspiracy among themselves to unreasonably restrain trade and impair Transitions' rivals in the Photochromic Treatment Market;

(h)     whether and to what extent, Defendants' and the John Doe Co-Conspirators' conduct caused Class members to pay supra-competitive prices and, thereby, suffer antitrust injuries; and

(i)     whether Plaintiff and Class members are entitled to any damages and, if so, the appropriate Class-wide measure of damages.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Monopolization
### Against Defendant Transitions Only

66.     Plaintiff incorporates by reference the preceding allegations.

67.     Transitions acquired, willfully maintained and unlawfully exercised monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a)     at the lens caster level: (1) adopting and publicly announcing a general policy of refusing to deal with lens casters that sell or promote any competing photochromic lens; (2) entering into exclusive agreements with certain lens casters; (3) threatening to terminate lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a competing  photochromic treatment; and

(b)     at the Prescription Lab and optical retailer levels: (1) entering into long-term exclusionary agreements with most major optical retailers; (2) entering into agreements with Prescription Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and withhold normal sales efforts for competing photochromic lenses; and (3) offering discounts only to customers who sold only or almost only Transitions' photochromic lenses.

68.     There is no legitimate business justification for Transitions' actions and the conduct through which it maintained its monopoly power in the relevant market.

69.     Transitions has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive products, by

CLASS ACTION COMPLAINT - 15

maintaining prices at artificially high levels, and by reaping the benefits of its illegally obtained and maintained monopoly power.

70.    The anticompetitive effects of Transitions' conduct far outweigh any conceivable procompetitive benefits or justifications.

71.    Plaintiff and members of the Class have been injured in their business or property by Transitions' monopolization of the relevant market.  Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for photochromic lenses, including Transitions lenses, than they would have paid absent Transitions' unlawful conduct.

## COUNT II

### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
### Conspiracy to Monopolize

### Against All Defendants

72.    Plaintiff incorporates by reference the preceding allegations.

73.    As set forth above, the Essilor Defendants actively facilitated Transitions' efforts to acquire, willfully maintain and unlawfully exercise monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a)    purchasing and selling only Transitions' photochromic lenses;

(b)    exercising their control over the John Doe Co-Conspirators to induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

(c)    in the case of Essilor of America, entering into agreements that effectively induced its Prescription Lab customers (other than the John Doe Co-Conspirators) to purchase and sell only Transitions' photochromic lenses.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

74.    Defendants and the John Doe Co-Conspirators sought to obtain, maintain and enhance Transitions' monopoly power in the Photochromic Treatments Market beginning no later than 1999 when Transitions began implementing exclusionary contracts with lens casters, including Essilor of America, to thwart competition from Corning and other potential rivals.

75.    Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary agreements, with Transitions, with each other, with the John Doe Co-Conspirators, and with their respective non-conspiring customers, that effectively blocked rival photochromic treatment suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing through the John Doe Co-Conspirators.

76.    Each of the Defendants and the John Doe Co-Conspirators has committed at least one overt act – such as entering into exclusionary agreements and selling Transitions lenses at supra-competitive prices – to further the conspiracy.

77.    Each of the Defendants and the John Doe Co-Conspirators intended that the conspiracy to monopolize alleged herein would maintain and enhance Transitions' monopoly power and injure Plaintiff and the Class thereby.

78.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the Class consists of paying artificially inflated prices for photochromic lenses, including Transitions lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

79.    The effects of Defendants' anticompetitive exclusionary acts have been to capture and/or maintain for Transitions more than 80 percent of the relevant market, to substantially

CLASS ACTION COMPLAINT - 17

1    impair and foreclose competition from Transitions' rivals in the Photochromic Treatment

2    Market, and to significantly raise barriers to entry for potential rivals.

3        80.    Defendants' conduct adversely affects competition and consumers by (1)

4    increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and

5    impeding the ability of Transitions' actual or potential competitors to enter or to expand their

6    sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing

7    consumer choice among competing photochromic lenses.

8

9        81.    Absent Defendants' conduct and the substantial foreclosure and impairment of

10   effective competition caused by such conduct, Transitions, as a rational actor, would have

11   reduced the price it charged to lens casters for its photochromic treatment of lenses and/or

12   supplied its low-priced, private label photochromic lens (which it offers outside of the United

13   States where it faces increased competition) in response to added unimpaired competition from

14   Corning, Vision-Ease and other rivals and potential rivals (*i.e.*, Prescription Labs and/or lens

15   casters that could have or would have developed their own photochromic treatments).  Moreover,

16   had actual or potential photochromic treatment suppliers not been substantially foreclosed or

17   stifled by Defendants' anticompetitive conduct from effectively competing in the market for such

18   products, those competitors and/or potential competitors would have sold much more of their

19   products, gained a larger market share and achieved economies of scale and scope that could

20   have further driven down prices in the marketplace.

21

22       82.    By unlawfully excluding and impairing competition, Defendants' conduct has

23   caused Plaintiff and other Class members to pay more for photochromic lenses than they

24   otherwise would have paid absent Transitions' illegal, exclusionary conduct.

25

26

CLASS ACTION COMPLAINT - 18

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**DAMAGES**

83.    As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Transitions lenses they purchased.  Had potential competitors been able to enter the market unimpeded by Defendants' illegal conduct (or been a threat to enter the market), Plaintiff and other members of the Class would have been able to, *inter alia*, purchase less expensive photochromic lenses.  The prices that Plaintiff and other Class members paid for photochromic lenses during the Class Period were substantially greater than the prices they would have paid absent the illegal exclusionary conduct alleged herein because: (a) the prices of all photochromic lenses were artificially inflated by Transitions' illegal conduct – as competitors were deprived of economies of scale and efficient distribution channels – and (b) Class members were deprived of the opportunity to purchase competing photochromic lenses and to purchase those lenses at lower prices.  Members of the Class have, as a consequence, sustained losses and damage to their business and property in the form of overcharges.  The full amount of such damages will be calculated after discovery and upon proof at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following:

A.    Certification of the Class proposed in this Complaint;

B.    Defendants' actions described herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.    Plaintiff and the Class recover damages, as provided by law, that they are determined to have sustained, and that judgment in favor of plaintiff be entered against Defendants;

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

D.    Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

E.    Plaintiff and the Class be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 30th day of March, 2010.

BYRNES ♦ KELLER ♦ CROMWELL LLP

By /s/ Paul R. Taylor
    Paul R. Taylor, WSBA #14851
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
(206) 622-2000
Fax: (206) 622-2522
ptaylor@byrneskeller.com
Attorneys for Plaintiff and the Class

Of counsel:

BERGER & MONTAGUE, P.C.
H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Andrew C. Curley
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000

CLASS ACTION COMPLAINT - 20

# EXHIBIT A



# 2008
# REGISTRATION
# DOCUMENT



FINANCIAL INFORMATION CONCERNING ASSETS AND LIABILITIES, FINANCIAL POSITION AND PROFITS AND LOSSES
2008 Consolidated financial statements

**20**

## NOTE 32. LIST OF FULLY-CONSOLIDATED COMPANIES

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| **FRANCE** | | | |
| BBGR | France | 100 | 100 |
| BNL Eurolens | France | 100 | 100 |
| Delamare Sovra | France | 100 | 100 |
| Essidev | France | 100 | 100 |
| Invoptic | France | 100 | 100 |
| Mega Optics | France | 75 | 75 |
| Novacel | France | 75 | 75 |
| Novisia | France | 100 | 100 |
| OMI | France | 100 | 100 |
| Optim | France | 100 | 100 |
| Satisloh SAS | France | 100 | 100 |
| Tikai Vision (ex Barbara) | France | 100 | 100 |
| **EUROPE** | | | |
| BBGR GmbH | Germany | 100 | 100 |
| Essilor GmbH | Germany | 100 | 100 |
| Nika | Germany | 75 | 75 |
| Rupp & Hubrach Optik Gmbh | Germany | 100 | 100 |
| Satisloh Gmbh | Germany | 100 | 100 |
| Essilor Austria Gmbh | Austria | 100 | 100 |
| Essilor Belgium S.A. | Belgium | 100 | 100 |
| Essilor Croatia | Croatia | 100 | 100 |
| Essilor Danmark A.S. | Denmark | 100 | 100 |
| BBGR Lens Iberia S.A. | Spain | 100 | 100 |
| Essilor Espana S.A. | Spain | 100 | 100 |
| Satisloh Iberica | Spain | 100 | 100 |
| Essilor OY | Finland | 100 | 100 |
| BBGR United Kingdom | United Kingdom | 100 | 100 |
| Essilor Ltd | United Kingdom | 100 | 100 |
| Essilor European Shared Service Center Ltd. | United Kingdom | 100 | 100 |
| Satisloh Ltd | United Kingdom | 100 | 100 |
| Sinclair Optical Laboratories | United Kingdom | 100 | 100 |
| United Optical Laboratories | United Kingdom | 80 | 80 |
| Essilor Optika Kft | Hungary | 100 | 100 |
| Athlone | Ireland | 80 | 80 |
| Essilor Ireland (branch) | Ireland | 100 | 100 |
| Essilor Ireland (Sales) Ltd | Ireland | 100 | 100 |
| Organic Lens Manufacturing (branch) | Ireland | 100 | 100 |
| ATR MEC Optical Milano s.r.l. | Italy | 100 | 100 |
| Essilor Italia S.p.A. | Italy | 100 | 100 |
| LTL S.p.A. | Italy | 100 | 100 |
| Oftalmika Galileo Spa | Italy | 100 | 100 |

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| Optilens Italia s.r.l. | Italy | 100 | 100 |
| Satisloh Italia | Italy | 100 | 100 |
| Essilor Norge A.S. | Norway | 100 | 100 |
| Sentralslip | Norway | 80 | 80 |
| Essilor Nederland BV | Netherlands | 100 | 100 |
| Essilor Nederland Holding BV | Netherlands | 100 | 100 |
| Holland Optical Corp. BV | Netherlands | 100 | 100 |
| Holland Optical Instruments BV | Netherlands | 74 | 74 |
| Omax | Netherlands | 51 | 51 |
| Essilor Optical laboratory Polska Sp. Z.o.o. | Poland | 100 | 100 |
| Essilor Polonia | Poland | 100 | 100 |
| Essilor Portugal | Portugal | 100 | 100 |
| Essilor Romania SRL | Romania | 100 | 100 |
| Omega Slovakia | Slovakia | 80 | 80 |
| Essilor D.O.O Slovenia | Slovenia | 100 | 100 |
| Essilor AB | Sweden | 100 | 100 |
| BBGR Skandinaviska | Sweden | 100 | 100 |
| Essilor (Suisse) S.A. | Switzerland | 100 | 100 |
| Satisloh Holding AG | Switzerland | 100 | 100 |
| Satisloh AG | Switzerland | 100 | 100 |
| Satisloh Photonics AG | Switzerland | 100 | 100 |
| Vaco Holding S.A. | Switzerland | 100 | 100 |
| Essilor Optika Spol s.r.o. | Czech Rep. | 100 | 100 |
| Omega | Czech Rep. | 80 | 80 |
| Essilor Optika OOO | Russia | 100 | 100 |
| **NORTH AND CENTRAL AMERICA** | | | |
| Aries Optical Ltd. | Canada | 100 | 100 |
| BBGR Optique Canada Inc. | Canada | 100 | 100 |
| Canoptec Inc. | Canada | 100 | 100 |
| Custom Surface Ltd. | Canada | 100 | 100 |
| Eastern Optical Laboratories Ltd. | Canada | 100 | 100 |
| Essilor Canada Ltd. | Canada | 100 | 100 |
| Groupe Vision Optique | Canada | 100 | 100 |
| K&W Optical Ltd. | Canada | 100 | 100 |
| Metro Optical Ltd. | Canada | 100 | 100 |
| Morrison Optical | Canada | 100 | 100 |
| OK Lenscraft Laboratories Ltd. | Canada | 100 | 100 |
| OPSG Ltd. | Canada | 100 | 100 |
| Optical Software Inc | Canada | 100 | 100 |
| Optique de l'Estrie Inc. | Canada | 100 | 100 |
| Optique Lison Inc. | Canada | 100 | 100 |
| Optique Cristal | Canada | 70 | 70 |
| Perspectics | Canada | 100 | 100 |

**20** FINANCIAL INFORMATION CONCERNING ASSETS AND LIABILITIES, FINANCIAL POSITION AND PROFITS AND LOSSES
2008 Consolidated financial statements

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| Pioneer Optical Inc. | Canada | 100 | 100 |
| Pro Optic Canada Inc. | Canada | 100 | 100 |
| R&R Optical Laboratory Ltd. | Canada | 100 | 100 |
| SDL | Canada | 90 | 90 |
| Westlab | Canada | 85 | 85 |
| 21st Century Optics Inc. | USA | 80 | 80 |
| Accu Rx Inc | USA | 80 | 80 |
| Advance Optical | USA | 90 | 90 |
| Beitler Mc Kee Company | USA | 90 | 90 |
| Collard Rose | USA | 80 | 80 |
| Dependable | USA | 80 | 80 |
| Deschutes | USA | 80 | 80 |
| Dibok Aspen Optical | USA | 80 | 80 |
| Dunlaw Optical Laboratories Inc. | USA | 80 | 80 |
| ELOA California Acquisition  Corp. | USA | 100 | 100 |
| Empire | USA | 85 | 85 |
| EOA Investment Inc. | USA | 100 | 100 |
| Essilor Latin America & Caribbean Inc. | USA | 100 | 100 |
| Essilor Laboratories of America Corporation | USA | 100 | 100 |
| Essilor Laboratories of America Holding Co Inc. | USA | 100 | 100 |
| Essilor Laboratories Of America Holding II | USA | 100 | 100 |
| Essilor Laboratories of America, Inc (inclus Laboratoires US) | USA | 100 | 100 |
| Essilor Laboratories of America, LP (inclus Avisia, Omega, Duffens) | USA | 100 | 100 |
| Essilor of America Holding Co Inc. | USA | 100 | 100 |
| Essilor of America Inc. | USA | 100 | 100 |
| Eye Care Express Lab Inc | USA | 80 | 80 |
| Focus Optical Labs, Inc | USA | 80 | 80 |
| Future Optics Inc | USA | 80 | 80 |
| Gentex Optics  Inc. | USA | 100 | 100 |
| Homer Optical | USA | 100 | 100 |
| Interstate Optical | USA | 80 | 80 |
| Jorgenson Optical Supply Cy. | USA | 80 | 80 |
| MGM | USA | 80 | 80 |
| Midland Optical | USA | 80 | 80 |
| Nassau Lens Co Inc. | USA | 100 | 100 |
| Next generation | USA | 100 | 100 |
| NOA | USA | 100 | 100 |
| Omega Optical General Inc. | USA | 100 | 100 |
| Omega Optical Holdings Inc. | USA | 100 | 100 |
| OOGP | USA | 80 | 80 |
| Opal Lite  Inc. | USA | 100 | 100 |
| Optical One | USA | 80 | 80 |

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| Optical Suppliers Inc. (Hawaï) | USA | 85 | 85 |
| Optifacts Inc. | USA | 100 | 100 |
| Optimatrix | USA | 80 | 80 |
| Ozarks Optical Laboratories | USA | 80 | 80 |
| Pech Optical | USA | 80 | 80 |
| Perferx Optical Co Inc | USA | 80 | 80 |
| Personnal Eyes | USA | 80 | 80 |
| Peninsula Optical Lab. | USA | 80 | 80 |
| Precision Optical Lab. (Tennessee) | USA | 80 | 80 |
| Precision Optical Co. (Connecticut) | USA | 80 | 80 |
| Satisloh Inc | USA | 100 | 100 |
| Select Optical Inc. | USA | 100 | 100 |
| Southwest lens | USA | 65 | 65 |
| Speciality Lens Corp. | USA | 100 | 100 |
| Stereo Optical Co. Inc. | USA | 100 | 100 |
| SunStar Inc. | USA | 80 | 80 |
| Sutherlin Optical Company | USA | 85 | 85 |
| Tri Supreme Optical LLC | USA | 100 | 100 |
| Uniscoat Inc. | USA | 100 | 100 |
| Vision-Craft Inc. | USA | 80 | 80 |
| Essilor Mexico | Mexico | 100 | 100 |
| Sofi de Chihuahua | Mexico | 100 | 100 |
| Vision Center S.A. de C.V. | Mexico | 100 | 100 |
| Rainbow Optical | Puerto Rico | 100 | 100 |
| **OTHER** | | | |
| Essilor South Africa (Pty) Ltd. | South Africa | 100 | 100 |
| Essilor Argentine S.A. | Argentina | 100 | 100 |
| AR Coating SA | Argentina | 95 | 95 |
| City Optical Pty Ltd. | Australia | 100 | 100 |
| Essilor Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratory South Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratories of Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratory Western Australia | Australia | 100 | 100 |
| Essilor Lens Australia Pty Ltd. | Australia | 100 | 100 |
| Hobart Optical | Australia | 100 | 100 |
| Tec Optik | Australia | 100 | 100 |
| Brasilor Participacoes Sc Ltda. | Brazil | 100 | 100 |
| Essilor Da Amazonia Industria e Commercio Ltda. | Brazil | 100 | 100 |
| Multi Optica Distribuidora Ltda. | Brazil | 100 | 100 |
| Sudop Industria Optica  Ltda. | Brazil | 100 | 100 |
| Polylite Beijing | China | 51 | 51 |
| Polilyte Shanghai | China | 51 | 51 |
| Satisloh Zhongshan | China | 100 | 100 |
| Satisloh Schenzen | China | 100 | 100 |

# EXHIBIT B



**essilor**

---

## NEWS RELEASE

---

## Essilor agrees to acquire Signet Armorlite

*Charenton-le-Pont (January 15, 2009 – 6:30 a.m.)* – Essilor International announced today that its US subsidiary, EOA Holding Co. Inc., has signed a share purchase agreement whereby it has offered to acquire the entire capital of Signet Armorlite, a manufacturer of ophthalmic lenses. The agreement is subject to certain standard conditions precedent, including approval by competition authorities in Signet Armorlite's main host countries. The acquisition is expected to be completed in the first half of the year.

Headquartered in California in the United States, it has revenues of over $130 million, approximately 900 employees, one manufacturing plant in Mexico, four prescription laboratories in the United States and Europe, and three distribution centers in Canada, Portugal and the Netherlands.

Signet Armorlite specializes in entry-level and mid-range products for independent eyecare professionals and integrated retailers. It also manufactures lenses under the Kodak brand, for which it is the exclusive licensed manufacturer and distributor. Led by its current management team, Signet Armorlite will continue to produce, market and distribute ophthalmic lenses under the Kodak brand.

-----------------------

*Essilor International is the world leader in ophthalmic optical products, offering a wide range of lenses under the flagship Varilux®, Crizal®, Essilor® and Definity® brands to correct myopia, hyperopia, presbyopia and astigmatism. Essilor operates worldwide through 15 production sites, 270 lens finishing laboratories and local distribution networks. The Essilor share trades on the Euronext Paris market and is included in the CAC 40 index. (ISIN: FR 0000121667; Reuters: ESSI.PA; Bloomberg: EI:FP).*

-------------------------

**Investor Relations and Financial Communications**
**Véronique Gillet – Sébastien Leroy**
**Phone: +33 (0)1 49 77 42 16**
**www.essilor.com**